UNITED STATES v. A. GOLDMARK & SONS CORP.

A. GOLDMARK & SONS CORP. v. UNITED STATES

No. 5992.—Invoices dated Lisbon, Portugal, April 10, 1939, etc.
Certified April 11, 1939, etc.
Entered at New York, N. Y., April 27, 1939, etc.
Entry No. 28041, etc.

(Decided April 3, 1944)

*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett* and *Richard F. Weeks*, special attorneys), for the United States.
*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for the importer.

COLE, Judge: These appeals present for determination the proper dutiable value of canned sardines, exported from Lisbon, Portugal, and entered at the port of New York. The kinds or brands included in the shipments in question are set forth in the following tabulation:

| Reap. No. | Date of exportation | Description of merchandise | Entered value |
|---|---|---|---|
| 137929-A | 4/10/39 | "Martel Brand"—Dingleys 1/4s.—Skinless | 27s.5d., less 10% discount. |
| 137930-A | 3/28/39 | "Martel Brand"—1/4 boneless & skinless sardines in pure olive oil | 27s.5d., less 10% discount. |
| 137931-A | 4/13/39 | "Splendour" Brand—Boneless and skinless sardines | 27s.5d., less 10% discount. |
| 137932-A | 4/15/39 | "Martel Brand"—American 1/4s.—Skinless | 44s.5d., less 10% discount. |
| 139206-A | 7/21/39 | "Martel Brand"—Dingleys 1/4s.—Boneless | 24s.5d., less 15% discount. |
| | | "Martel Brand"—American 1/4s.—Skinless | 44s.10d., less 15% discount. |

Consolidation of the cases, for the purposes of trial and decision, was permitted after the parties had agreed that the merchandise and the issue are substantially the same in all, and that the evidence offered by each side is to be considered as directly applicable to the issues presented.

In the first four of the enumerated cases, the appeal was filed by the collector of customs, the entered value having been accepted by the appraiser, and the merchandise accordingly appraised. In the

last case, reappraisement 139206–A, where the importer filed the appeal, the entered value was advanced by the appraiser.

The Government's contention was stated at the trial by counsel in the following language:

The merchandise was appraised on the basis of export value. In the first four cases; that is in the first four cases, and the collector having received information that a higher value existed abroad, appealed to reappraisement. In the fifth case, the appraisement was made on the basis of the foreign value contended for by the Government, and the importer appealed, contending for his export value.

The values claimed by the Government are the list prices for the kinds of sardines in question as set forth on a price list attached to the special agent's report (exhibit 1) and the affidavit (exhibit 13), which will be discussed further in reviewing the evidence.

Importer's claim, as set forth by counsel in their brief is—

that such and similar merchandise was on the dates of exportation freely offered for sale to all purchasers in the principal markets of the country of exportation in usual wholesale quantities and in the ordinary course of trade for exportation to the United States and for domestic consumption in Portugal at the I. P. C. P. list prices less discounts of from ten percent to twenty-five percent and that the usual discount was fifteen percent.

The issues presented by the statements of counsel, viewed from their agreement on the manner of offering evidence, are, first, whether foreign value, section 402 (c) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1402 (c)), as amended by the Customs Administrative Act of 1938 (52 Stat. 1081), or export value, section 402 (d) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1402 (d)), is the correct basis for appraisement; and second, the specific values representative of the proper basis.

The record consists of 12 customs agent's reports (exhibits 1 to 12) introduced by Government counsel, 10 affidavits (exhibits 13 to 22) offered by counsel for the importer, and the oral testimony of 3 witnesses, 2 of whom appeared on behalf of the importer, the third being the customs agent who conducted the investigation covered in all of said reports, except exhibit 8 which is without probative value for the purposes of this case. Substantially all of the Government's evidence is embodied in the remaining 11 reports, the oral testimony of the customs agent adding nothing thereto. Although the Government's investigation was conducted between the first week of November 1939 and January 1940, when the special agent was in Portugal for that purpose, and the reports bear dates in 1940, subsequent to the period involved herein, much of the information submitted by the said customs official is material to the issues.

When the several special agent's reports were offered, there was no objection to their admission as evidence, but counsel for the importer in their brief, discuss the evidentiary value attached thereto, disputing,

to some extent, the relevancy of information contained therein and the comparative importance of oral statements by the special agent and those submitted in his reports. My attitude concerning the admissibility of such documents was expressed in *Florea & Co., Inc.* v. *United States*, 11 Cust. Ct. 37.7, Reap. Dec. 5907, as follows:

There can be no doubt as to the intent of the Congress in its enactment of said section 501 to permit the receipt in evidence of reports of customs agents. The Government has granted importers the privilege of presenting their grievances before this specially created tribunal and has been most liberal in safeguarding rights of equal dignity and importance with those of other courts of record, to them. In litigation growing out of the appraisement of imported merchandise, the Government must of necessity resort to investigations, in most instances far from the port of entry. Experienced and reliable Government agents designated for such purpose cannot be available at all times when cases in which they are interested are before this court. If they are, they should be compelled to take the stand if demanded by either party, and be subjected to any cross-examination involving their association with the investigation entrusted to them and the report as a result thereof. But the report, itself, should not be excluded because the agent who prepared it is in court. The language of the statute is plain and unambiguous, expressing a legislative intent that relaxes the hearsay rule and permits such reports to be admitted in this class of cases. And the acceptance of such reports for their evidentiary value applies with equal propriety even though the author, for obvious and sound reasons, is not present at the trial. The conclusion on this proposition is in harmony with views of this court set forth in *Luigi Vitelli Elvea, Inc.* v. *United States*, Reap. Dec. 5661.

The consideration given the reports admitted herein is explained in the analysis of proof, hereinafter set forth.

The outline of conditions in the Portuguese sardine market, set forth in the report, exhibit 1, reveals the following situation: Since 1935, all manufacturers or packers have been members of an organization called the "Portuguese Preserved Fish Consortium," controlled by a semiofficial Government organization known as the "Institute Portuguese de Conservas de Peixe," commonly referred to as the "I. P. C. P." The consortium was established to stabilize prices, and to effect such purpose it issued a price list, attached to the said report, setting forth minimum prices at which sardines were to be sold throughout the industry. The control was directed primarily toward the export market, but the official basic prices were also applied to sales for the home market in Portugal. The price list was closely adhered to until the "fall of 1938," when the practice of granting discounts from such prices was instituted. As the practice developed, allowances ranged from 5 per centum to 20 per centum until the outbreak of the war in September 1939, when the market underwent a radical change and prices began to rise, reaching such proportions that the official minimum prices were ignored and the entire price list became utterly useless.

The same report says that "The quality or pack of the sardines as sold for export to the United States is in no way different from that

sold in any other market." Some American importers have their own label or brand in which cases sales thereunder are restricted to the owner of the particular label. The quality of the sardine is always the same, notwithstanding an invoice declaration "Specially packed for the United States." There is a difference in the containers used in packing sardines for the American market due to regulations of the United States Food and Drug Administration which require "a tin with a minimum amount of lead." The export market for sardines is much more extensive than the Portuguese home market. Comparatively few packers or manufacturers deal in the home foreign market. The three qualities principally sold for export to the United States are the "boneless and skinless," "boneless," and "plain olive oil." The types "100/4 Americano 30 m/m" and "100/4 usual 22 m/m" are frequently invoiced as "American halves or ½ Americans" and "¼'s," respectively, such descriptions relating to the type of container.

The special agent's reports (exhibits 2 to 11) discuss transactions of various packers of sardines in Portugal, each document dealing with the business of a different firm. All refer to specific sales, setting forth tabulations showing the date of sale, the consular invoice, the name of the customer, and the rate of discount where one was allowed. On the United States export sales, one report, exhibit 11, describes the kind of merchandise covered by the listed sales. Some of the other reports contain a general statement, like the one in exhibit 2, that the "tabulation covers sales of various size cans of sardines in skinless, boneless, and otherwise." The evidence is convincing, however, that the descriptions sold to the American market are extremely limited, and that the United States export sales set forth in the Government's reports relate to merchandise included in the shipments in question.

The sales reported by the special agent extend beyond the period, April 1, 1939, to September 1, 1939, to which determination of this case must be confined. The particular period mentioned is controlling because it is "indicative of the method employed" (*United States* v. *Mexican Products Co.*, 28 C. C. P. A. 80, C. A. D. 129) by the packers in the sale of sardines, like those in question, both for consumption in Portugal and for export to the United States. This is so because the period is representative of the time when the matter of discounts from the official price list formed the basis of actual selling prices. It embraces the exact dates of exportation of the instant merchandise, and it immediately preceded the outbreak of war in September 1939, when new and entirely different market conditions developed.

It is also important to observe that the entries in question were made subsequent to enactment of the Customs Administrative Act of 1938 (52 Stat. 1081), which amended section 402 (c), *supra*, limiting

dutiable foreign value to the price at which merchandise is "freely offered *for sale for home consumption* to all purchasers." [Italics mine.] Hence, all information concerning export sales to countries other than the United States is immaterial to the instant case and consequently will be given no consideration.

Within the limitations set forth, I find 67 sales were made, 63 of which covered merchandise exported to the United States and 4 for home consumption. Of the home market sales, two were at a discount of 20 per centum and two were at the list prices. The latter were made to a "customer at Lisbon," one for "25 cases 100/4 Americanos 30 m/m olive oil" and the other for "10 cases 100/4 Americanos 30 m/m olive oil." Of the export sales, 54 were at discounts ranging from 5 to 20 per centum, and 9 were at the basic list prices. The 9 sales in which no discount was granted included 1, under date of August 31, 1939, to the importer of the shipments in question from Algarve Exportador, Ltd., one of the exporters of the instant merchandise, and 3 to Calderon & Co., a partner of which company appeared herein as importer's witness, whose testimony is reviewed later.

The special agent's report, exhibit 12, is rebuttal of the importer's affidavits, exhibits 13 to 21, and will be referred to in discussing them.

The affidavit, exhibit 13, was executed by a director and partner in the said Algarve Exportador, Ltd., and lists eight sales of merchandise like that in question exported to this country, four being to the present importer and four to Seeman Bros. of New York City, in all of which a discount of 10 per centum was granted. The affiant distinguishes between the kinds of packings exported to the United States and those sold for home consumption, stating that the "plain," "boneless," and "boneless and skinless" varieties are sold to the United States, and that "In Portugal the major business is done in a description known as 'Club 4½ oz. 30 m/m,'" although he admits that there have been sales in Portugal of the "American descriptions," but such sales "have been rare." Following the statement that his company is "one of the largest sellers for domestic consumption in the Portuguese market," is a list of amounts of American descriptions, aggregating 66 cases, sold during the period under consideration for home consumption. No detail is given concerning the home market sales, the affidavit merely stating that such sales were made "at a price at least 10% below the minimum prices shown on the price list of the IPCP (Portuguese Preserved Fish Institute) dated June 9, 1938," and were "in accordance with the provisions regarding such sales contained in the IPCP Circular No. 261, dated October 21, 1935." The failure to itemize the sales for home consumption, like the listing of export sales, lends support to the statement of the special agent, exhibit 12, that "this firm sells in the home market (sales for

consumption in Portugal) only through an exclusive sales agent in Lisbon who in turn resells to the Portuguese trade." The same customs official in his report, exhibit 5, referring to the same packer, said that "Copies of home sales are, however, not set forth in this report due to objections on the part of the manufacturer." In the light of these contradictions, the said affidavit, so far as its references to home market transactions are concerned, loses much force and effect.

A copy of the "IPCP Circular No. 261," mentioned in the affidavit, is attached thereto. The pertinent part relates to the practice in Portugal of packers selling to specially authorized exporters in the home market, allowing such dealers a 12 per centum discount from the official list price. The rate of allowance is the result of a calculation by the "I.P.C.P." to offset charges borne by the packer where direct exportation is made. Sales by special exporters might be a consideration in determining dutiable export value, but such restricted transactions have no materiality in finding statutory foreign value.

The affidavits, exhibits 14 to 20, are in identical language. Each was executed by a representative of a firm of sardine packers in Portugal, some of which were investigated by the special agent, and whose transactions are outlined in reports already referred to. All of these affidavits state that during the period under consideration sales of canned sardines were "freely and regularly" made "in the Portuguese home market at a discount of 12% below the minimum prices shown on the price list of the IPCP (Portuguese Preserved Fish Institute) dated June 9, 1938," and that such sales "were made in consonance with the rules and regulations of IPCP and in accordance with the rights given to make such sales in the Portuguese home market by IPCP Circular No. 261, dated 21st October 1935." The circular is the same one previously discussed, and of course the same ruling is applicable. Moreover, the language in the affidavits that sales were "freely and regularly" made at a discount of 12 per centum is not sufficient to meet the requirements of the statute, section 402 (c) and (d), *supra*, that the merchandise must be "freely offered to all purchasers * * * in the ususal wholesale quantities and in the ordinary course of trade." The affidavits, as presented, have little, if any, probative value. In view of this conclusion, it is unnecessary to discuss further the Government's report, exhibit 13, which very strongly disputes the accuracy of statements made in the affidavits reviewed.

The affidavit, exhibit 21, describes different packings, distinguishing those exported to this country and the ones sold for home consumption, emphasizing that "there is no comparison in either the quality, size, shape, or price of the tins." There is reference to a price distinction made in sales of sardines for home consumption.

discounts between 12 and 15 per centum being allowed, but the statement is so vague and indefinite as to be ineffective.

The oral testimony introduced by the importer lends much support to the description of conditions in the sardine market of Portugal as outlined in the Government's evidence. The vice president and treasurer of the importing corporation—the largest importer of sardines in the United States—who purchased the merchandise in question, substantiated the statements of the special agent concerning discounts, testifying that the rate allowed was a matter of negotiation and usually represented a compromise between the offer by the foreign packer and the proposal of the American importer. He identified the prices for the present merchandise on the price list attached to the affidavit, exhibit 13, stating that the prices shown thereon are the bases from which the discount was figured. He testified that the invoice prices are those actually paid by his firm for the instant merchandise, and explained the difference in the rate of discount set forth on the invoices and those stated on entry as follows (R. p. 37):

When the market started declining and purchases were easily made at list prices less a discount, the discounts at which we entered were 10 percent, then the market began getting even weaker, until finally goods were freely offered here at the list prices less 15, 20, and I speak now only as to my own knowledge, up to as great a discount as 25 percent, and as President of the Association [Associated Importers of Food Products], I called on Mr. Cryan [Customs Examiner], and he did not want to accept the higher discounts, and as a matter of expedience, and in order to save court action, I agreed with him speaking for our Association, and the reason for the existence of it, that we would make the entries less 10 percent. In other words the discounts were much greater than 10 percent, but we were willing to have 10 percent in order to avoid litigation, and that was the reason, from then on we stuck to 10 percent, because he had agreed in turn the evidence had led him to believe 10 percent was the proper figure. So it was a matter of agreement.

The witness' concurrence with the special agent's view that all sardines are the same, notwithstanding the use of labels, appears in the following excerpt from his testimony (p. 35):

X Q. On the invoices Mr. Witness, I find the words "Martel Brand" and "Splendour" brand. What does that mean, if anything?—A. Those are just trade marks and all canned goods are sold under a trade mark, and our particular trade mark is "Martel," and the style is—

X Q. That was your own brand?—A. "Martel" was our own brand.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

X Q. The brand is simply the name attached to the different American purchases they have there?—A. Simply like a tag.

X Q. The sardines were not caught in different waters?—A. No, they were the same. In fact the packer in the morning might be filling his "Martel" cans, and in the afternoon put his sardines in the can marked "Splendour." I would not admit that to the consumer, but for court purposes, yes.

Importer's other witness testified that he is a partner, associated for 20 years with Calderon & Co., agents in this country for 14 packers

of sardines in Portugal, that he has had personal supervision of the sardine business handled by his company which required him to make frequent visits to Portugal to negotiate purchases of sardines for his principals, and that he was there for such purpose in 1939, from May 14 until the early part of July. His testimony concerning conditions existing in the Portuguese sardine market during his stay in 1939 supports the following summation: The home market in Portugal deals very largely with the so-called "club sardine," the word "club" relating to the type of container. It is a "very current quality of pack," prepared very quickly, usually in peanut oil, with a view of "getting as many tins done during the day as possible." While it is good food, it is packed "with no particular care given them," and without any brand name attached. The sardines shipped for the American market are known as specialties, meaning "it is a specialized form of packing," and consist of varieties or descriptions known as boneless and skinless, boneless, and plain sardines in American-type cans. Of 200 packers only 10 per centum of them are equipped to pack for the American market, due primarily to the fact that "our own Food and Drug Administration is rather stringent on the lead content of sardines." To prepare sardines for export to this country "requires certain equipment that not every factory can buy in Portugal, like sanitary cans; deep stamping machinery; automatic fillers for oil, which not every factory has; running water for cleaning the fish, instead of stagnant water, not every factory can put in, and several other angles."

The basic prices were those set forth on the official list hereinabove referred to, but actual selling prices, on merchandise exported as well as on that sold for home consumption, were the result of negotiations between packers and purchasers. On sales to this country, the discount ranged from 10 to 20 per centum, the testimony in connection therewith being as follows (p. 48):

Q. Limiting your answer to the time you acted as agent for these factories you referred to, what was the usual discounts allowed during that time?—A. Each factory had a different price, or let us say it this way, each factory quoted a different discount.

Q. But all using the same price list?—A. All using the same basic prices, and my importations would therefore run from 10 percent to 20.

Q. The discounts?—A. The discounts.

Q. Would that apply to the different descriptions you have here?—A. That is right.

Q. Would that variation be at two different times, or vary at the same time?—A. No, those variations were due to some packers having had a better known brand than others, and some packers were not so interested in the American market as others. * * *. It was not a question of time, it was a question of negotiations.

Q. Do you know of any discounts that were less than 10 percent?—A. No.

The last answer is contradicted in the Government's evidence, exhibits 7 and 9, showing sales to the witness' firm at the basic list prices.

Further testimony by the witness revealed that the variance between 10 and 20 per centum discount applied to shipments under packers' labels, but where the importer had merchandise packed under his own brand, the discount fluctuation was between only 10 and 15 per centum. The reasons for this distinction were stated as follows (p. 58):

X Q. Was there a fluctuation in the discounts offered between the different brands that were owned by the American importers?—A. No, that is pretty steady.

X Q. Between 10 and 20 percent?—A. No, I would not say that; I would say 10 and 15 percent for brands belonging to American importers.

X Q. Now what was the controlling feature? * * * A. In one instance the goods were ready, they belonged to the packer, his own brand, on the other hand, he would have to enter into a contract, where he would have to order the tins, and the fish were still in the sea, and then he would have to make a brand which he did not control, so naturally he would ask a higher price, and only conceded a smaller discount.

X Q. As to these brands the discounts fluctuated between 10 and 15 percent?—A. Yes.

X Q. What was the feature that caused that?—A. Some packers packed better than others; some were in a financial position better than others, whereas those not so well situated or known in the United States, or not so well trusted would give a higher discount.

The market for home consumption was comparatively small, not only in the number of packers but also in the quantity of merchandise sold, but there were some sales of sardines like those covered by the shipments in question. The witness testified, based on an examination of about a dozen invoices from three different packers, that the discounts allowed on such sales ranged from 10 to 24 per centum.

All sales referred to in the evidence were wholesale, the usual quantity for export being from 100 to 500 cases and that for home consumption 5 to 50 cases. Since, however, the price does not vary according to the quantity sold the element of "usual wholesale quantity" does not enter into finding dutiable statutory value. *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093.

It is fairly established by this record that sardines, of the descriptions in question, were sold and freely offered for sale, during the period under consideration, in the principal markets of the country of exportation both for export to the United States and for domestic consumption in Portugal. In view of this conclusion, it is unnecessary to consider the availability of similar merchandise, under the rule announced in *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, wherein the court said:

* * * . The law does not use the words "such" and "similar" synonymously, but with differing meanings, and alternatively. In our opinion, foreign value was to be ascertained, first, by "the market value, or the price * * * at which such," or the *identical* merchandise is offered for sale on the foreign markets, as provided by the statute, and, second, in the event that such merchandise is not so offered, then by "the market value or the price," at which *similar* mer-

chandise is so offered. If the word "similar" means no more than the word "such," then there is no reason for it being used in the statute. * * *.

It is also clear from the evidence herein that sales of these sardines for export to the United States greatly outnumbered those for home consumption, and that transactions in which discounts were allowed on export sales largely exceeded such sales made at the list prices. But these factors are not controlling in finding either foreign or export value. It is the price at which *all purchasers* may buy that is determinative. In construing the italicized statutory term in *United States* v. *American Glanzstoff Corp.* (24 C. C. P. A. 35, T. D. 48308), the court said:

* * *. The expression "all purchasers" does not mean the members of some association only, or 99 per centum of the purchasers of such goods, or those who would not thereafter buy such goods from someone else, but it does mean all of those who cared to buy such goods in such markets. * * *.

In the present case, no fixed prices existed for the instant merchandise at the time of its exportation. Purchasing was bargaining, the rate of discount being based on many different factors none of which related to the merchandise *per se*, but rather to the label or brand used and the financial position and interest of the packer. But the focal point from which all negotiations began was the basic price shown on the official list of the I. P. C. P. These were the prices at which the merchandise was freely offered throughout the sardine industry. They were prices at which anyone, who wanted, could buy. The factual situation is similar to that presented in *United States* v. *Mexican Products Co.*, 28 C. C. P. A. 80, C. A. D. 129. There, as here, the major portion of sales was made at the manufacturer's list prices less various discounts, although some purchasers bought at the list prices. Following the construction adopted in the *American Glanzstoff Corp.* case, *supra*, the court held:

As there is no evidence of record that merchandise like that here involved was sold or freely offered for sale to *all purchasers* in the usual wholesale quantities and in the ordinary course of trade in the principal market of Mexico, either for consumption in Mexico or for export to the United States, at prices less than the manufacturer's list prices, it should have been held that the proper dutiable values of the involved merchandise are the manufacturer's list prices, plus packing. * * * .

The same principle has application here. Accordingly, I hold the list prices set forth on the schedule attached to the special agent's report, exhibit 1, and the affidavit, exhibit 13, to be the prices at which the sardines in question were freely offered to *all purchasers* within the meaning of that statutory term, section 402 (c) and (d), *supra*, for appraisement purposes. While such prices were applied to both export and home market sales, they were fixed primarily for the export market, and therefore included certain charges, particularly an item of export tax, for which allowance was made when the goods were sold

for home consumption. The effect was to give the purchaser in the Portuguese market a lower price.

On the basis of the foregoing, I hold export value, section 402 (d) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. §1402 (d)), to be the proper basis for appraisement of the instant merchandise, and that such values therefor are the following basic prices set forth, and identified by the importer, on the official list hereinabove referred to:

| Reap. No. | Description of merchandise | Dutiable export value |
|---|---|---|
| 137929–A | "Martel Brand"—Dingleys ¼s Skinless | 27s. 5d., packed. |
| 137930–A | "Martel Brand"—¼ boneless & skinless sardines in pure olive oil. | 27s. 5d., packed. |
| 137931–A | "Splendour" Brand—Boneless and skinless sardines | 27s. 5d., packed. |
| 137932–A | "Martel Brand"—American ¼s Skinless | 44s. 10d., packed. |
| 139206–A | "Martel Brand"—Dingleys ¼s Boneless | 24s. 5d., packed. |
|  | "Martel Brand"—American ¼s Skinless | 44s. 10d., packed. |

Judgment will be entered accordingly.